Please call the next case. 1-5-31-29 W.B. Olson, Inc. v. Payne, Inc. You may proceed. Thank you. Good afternoon, Justice Council. Daniel T. Ugasti on behalf of the appellant, W.B. Olson. I'm here to ask you to overturn the Circuit Court's decision confirming the Commission's decision, which modified in part and otherwise affirmed and adopted the decision of the arbitrator in this case. And I do so because of three reasons, really. The Commission's decision fails to address a number of issues that were raised before it. It relies on evidence not in the record, as well as it disregards part of the general purpose of the act. That being that after an employee has an accident and has proper medical care to make them as whole as possible, they should ascertain the true residual disability and whether or not the employee can return to their job, and then determine the best, most efficient way possible for the employee to return to work earning the most money possible. And the latter, of course, is done with a cost-benefit analysis weighing the benefits to the employee versus the cost to the employer. And where is this coming from? Is this just your own understanding of the purposes of the act? Is this in your interpretation of case law? Well, it's based on part of National T, the cost-benefit analysis of whether or not vocational rehabilitation should be pursued versus not pursued, as well as other case law that is cited within the record. No, there's no direct statement to this. This is what I am taking from those cases, though. In this case, the commission found there was an aggravation of a preexisting condition, correct? Correct. And they can't do that within the purposes of the act? Oh, sure. I'm not disputing any of the findings on causation that this man's knee condition is related. We have no question about that at all. What the commission did, though, well, we are asking, first of all, that the court ask them to rule directly on whether we are entitled to an FCE. Where in the code does it say you're entitled to an FCE? There's nothing that directly states that. Section 12. There is a section that says you're entitled to a Section 12 examination by a physician. Yes, sir. Does it say anywhere in there you can have an exam by a therapist? It does not state that directly. Technically it says medical practitioner, though, and in using the argument that while we have an examination by a physician or a surgeon, and they use various tools in determining the nature and extent of people's disability and their ability to return to work, an FCE is one of those tools that they often use. Surgeons order them all the time. As a matter of fact, one was ordered in this case. And the only reason we're asking for another one is time had passed, additional evidence had come in following the petitioner's surgery, which showed that he could probably do something more to where Dr. Tonino felt. What would happen if you had a claimant that went to a Section 12 examination and the Section 12 doctor said, I don't like the MRIs that have been taken yet, go get another MRI? And the guy said, I won't do it. Can you force him to do it? I don't know. Well, if he didn't like the MRI or the MRI, he saw it. But there was no MRI. And he says, go get an MRI. And the claimant says, I won't do it. If it's a noninvasive procedure and it's used to determine the person's condition and their disability and the employee couldn't show that there's a reason why he can't go for an MRI, he's claustrophobic, something along those lines, I believe it should be part of the Section 12 examination. You should probably, I think you can make a strong argument that these things should be part of Section 12. But that's something you've got to tell the legislature. The legislature says you get an examination by a physician. It doesn't say you get MRIs. It doesn't say you get FCEs. It doesn't say anything else. You get an examination by a physician. That's all you get. I mean, it occurs to me that if the legislature wanted to give you all this stuff, they'd give it to you. But they haven't. I mean, what are we to do about it? We can't really write Section 12. Your Honor, I am just asking that Section 12, and I understand what you're saying, it's not directly stated in there. It would be nice if it was. It would be better if it was. But oftentimes, X-rays, different types of strength testing are done within these examinations. And they've been done for years as a matter of practice. I just believe at this point, FCEs have been around for a period of time, not as long as some of these others. It's sort of a natural extension that has followed the Section 12 examination. That's the argument we're putting forward today. Okay. What about the evidence here? I mean, your argument has some plausibility to it. But confining ourselves to the evidence, I mean, the commission found that the claimant's condition was that the pre-existing condition that was aggravated by the work. Correct. Okay. There was Dr. Welch, as I understand it, who said the job activities could have aggravated his symptoms. Dr. Bender said the opposite. The commission found that there was an aggravation of a pre-existing condition. So why is it against the manifest weight? Justice, I apologize. I don't have those doctors involved in my case. Okay. I have Dr. Tonino. You're right. I have Dr. Chan and Dr. Bush-Joseph. So it's still up to the commission, though, to weigh the credibility and the believability in the medical evidence, correct? Correct. We are not arguing that the condition is not causally connected. We fully agree that it is in this case. It's whether or not we're entitled to an FCE and the appropriateness of the vocational plan that was in place. That's all we're really here arguing today, as well as a short period of maintenance benefits, when we don't believe that the employee was engaged in active vocational rehabilitation for a time. He merely drove a truck on a few occasions over a period of months, which we don't believe supports an award of maintenance benefits. Those are the only issues we're raising today, Justice. Going back to that, the commission, I believe, improperly relied on something that's not in the record. They held that the insurance issue had resolved by the time of oral arguments and that the employee was driving a semi-tractor, therefore it was unnecessary and inappropriate to order a repeat FCE or a formal vocational plan, and that the question of restrictions is moved. But there's no evidence of that in the record. The record at the time of the arbitration hearing, the employee had not returned to work. He was still getting paid maintenance benefits. The commission couldn't, shouldn't, the commission can't consider and should not have rendered such a finding. It should have decided these issues instead. If these issues were still not in dispute and relevant to my client, they would not have paid me to be here today. The employee is alleging he can't return to work in his prior position and vocational rehabilitation appears to be necessary in this case. We've discussed at some length already the FCE and whether or not it's appropriate. I've set forth my reasons as to why I believe an FCE should be ordered in this case and the court's ability to do so pursuant to Section 12. As far as the issue of vocational rehabilitation, the commission, we believe, failed to address the vocational rehabilitation plans and indicate what plans should be followed and what provider should do so. Now, it makes a few statements concerning vocational rehabilitation and its decision. At first it says that MNIC is less than credible, and that shows a leaning, but it's not necessarily a ruling as to whether or not they'd order his plan. They also fail to say, though, why he's not credible. But it also affirmed and adopted the arbitrator's decision. The arbitrator stated that he should continue, the employee should continue with Mr. Gryzik's plan because since 1997, the commission says an employee gets a right to choose a vocational counselor. Now, I don't believe, it's hard to tell from the commission's decision, but based upon the language of the second page, that they necessarily affirm this portion of the arbitrator's decision. However, to the extent that they may have, I ask that you overturn them in that regard. The commission needs to either decide this issue or be told that they have decided incorrectly. There's nothing that says when the parties can't agree on a vocational counselor that the employee has the right to choose it within the Act. If there's a disagreement, I believe the Act provides that the two parties get to submit their plans and then the commission decides who should be used and which plan would best suit the petitioner or the injured worker. The employee's attorney asserts and is correct that the Act does state that the employee has a right to choose physicians, but the employee is given no such right to choose within the Act for the vocational rehabilitation counselor. This is a matter of statutory construction and legislative intent. One of the rules of statutory construction is where a statute lists these things to which it refers, such as in this case the choice of doctors, but is silent on others, there's an inference that the omissions are understood as exclusions. In this case, the legislature did not give the employee the right to choose their vocational rehabilitation counselor. Therefore, we believe it was meant as an exclusion. We also believe that the 2005 amendment supports this inference, because the amendment states that all disputes on vocational rehabilitation should be decided by the commission, not that the employee gets to choose. Therefore, if you believe it's undecided, we ask that you remand it back to them and ask them to decide it or instruct them that it is not the employee who gets to decide and that the decision that Griesig's plan should be used is against the manifest weight of the evidence. And why specifically is that? Why can't the commission decide that Griesig's plan is superior to Minick's? Well, if Griesig's plan hadn't failed over an 18-month period, Your Honor, I would agree they'd be fully allowed to. We tried Griesig's plan. We went along with Griesig's plan. We paid for Griesig's plan. And in those 18 months, the employee never got his GED. He never got his job. He obtained a CDL license after approximately a year. But Griesig's wasn't even trying to push a job to go along with the CDL license. Minick says he has a new way to address finding a job as a truck driver if he has to. If there's an insurance problem, put him through school. Trucking companies hire out of schools all the time. He may have a license, but if what it takes is to show he's been retrained and is capable of doing the job, let's go that route. He also said he has new ideas for a GED. Get him some personalized tutoring. Don't just send him to school, find extra help whenever it's available. Let's get him a personalized tutor. Let's get this man his education, get him a job, and get him back to work, earning the most money he possibly can. Minick says he'd be more hands-on. And he'd also said he would have worked with him towards getting an FCE and work conditioning if it were appropriate, as was indicated by both the therapist and Dr. Tonino. We also asked that you address the maintenance issue. And therefore ask that this court either order the FCE, order the commission to enter Mr. Minick's vocational plan and him as a counselor, and also find that the maintenance benefits not warranted for the period requested in our briefs be overturned. Thank you. Counsel, I have one question. Regarding the FEC, should we agree that it would be the first court to order this examination under Section 12? To my knowledge, beyond the commission, yes. This would be the first time it's before any court within Illinois that I've been able to find. Okay. Thank you. Okay. Thank you. Thank you, counsel. Counsel, you may rise. Thank you, Your Honor. May it please the court, Mr. Ugasti. Your Honor, I'm somewhat taken aback, so I'm going to address this issue right up front, because I will state as an officer of the court that at the time of oral arguments, Mr. Ugasti and I concurred in notifying the commission that my client, Mr. Colon, had in fact obtained employment. I'm stunned that this issue would even be mentioned in this court, but in fact, I had previously, prior to oral arguments, sent a communication to Mr. Ugasti enclosing a copy of my client's initial paycheck for the purpose of establishing his rights under 8D1. So given the fact that the commission has de novo jurisdiction, I was not anticipating that they would include that declaration in their opinion. I don't think it was necessary. I don't think it's reason for reversal, but I wanted to set the record straight. Your Honors, this case is about control. You read the newspapers. You know what's going on. We're not talking about anything other than control. The clenching, the compression, the control, the domination, the under-the-thumb activities of respondents has gained much speed, almost to the point where it abridges individual rights. And maybe some of you on this panel will disagree with me, maybe even vehemently, but the fact of the matter is personal dignity and personal rights certainly still play a role, not only in this statute, but in all statutes in this state. When we look at the right to choose a vocational rehabilitation specialist, that right is tantamount to the same as a medical provider. In fact, the legislature, as Mr. Ugasti pointed out, finally in 2005 said, pick a certified. Here are the credentials that they have to have. And when you read this record, you will find that Mr. Gresick has all of the credentials and then some. Not only has he been a certified expert based upon federal law, but has testified many, many times, and I'm sure since the early 80s when this panel was first constructed by the Supreme Court, you've encountered that, although most of you were younger than that. But the fact of the matter is, when a person gets injured, why is the initial argument that suspicion must be raised? In this record, they reference a DVD where they surveilled my client to see, to verify what he was doing. What was he doing? He was going to a belly health club for the purpose of trying to strengthen his quads. Counsel points to the detrimental activity with regard to the GED as if this guy has an IQ of 140, should look at this with a great deal of joy, and simply put his nose to the grindstone. That sounds like indentured servitude to me. I own you. You will conform to the parameters I establish. And if you don't like that, and you've heard cases that fall into this category, we're going to enact the economic death penalty. We're going to cut off your workers' compensation benefits. We're going to hang you out to dry. And during the interim, while we litigate these cases for whatever time it takes all the way up to this level, suffer. Suffer. You know, I wonder sometimes when I read the statute, why is 19D even in there? You know, the injurious practices. Why is it that the respondents have the right to bring reverse 19Bs but never exercise that right? Because they can. We are situated in a position where the benefits have been eroded. We are caught in a situation where the number of filings has been cut in half over the last two decades. We are situated in an economic vice, as in this case, where Mr. Minnick, the superior expert, and I never admitted he was an expert. The arbitrator certainly didn't find he was an expert. Commission didn't find that he was an expert. In fact, they said he wasn't even credible. You read the record of the inquiry made by the arbitrator. I asked him on cross-examination, how many people did you help last year? Well, do you mean nurse case management or, no, I take that back, medical case management or vocational rehabilitation? I followed up and said, well, you got medical training? No. But think about that. You've encountered that situation. This guy's managing medical, dictating to physicians how they're supposed to practice. But let's revert to the vocational rehabilitation subject of today's case. This man was asked if he knew, in the geographically accepted area of Mr. Coleman, what the unemployment rate was. And you know what happened in 2009. I don't have to edify you to that. He didn't know. But he admitted it. Yeah, it was about 9%. I asked him about the shadow unemployment. The real number is, some economic professors call it, it's 16 to 17%. Does anybody believe for a moment that there's employment readily available for a plus-50-year-old gentleman who's got a unicompartmental replacement who has limited transferable skills, who didn't graduate from high school, and he's dogging it because it's taking this long except for the hiatus when he had to have his surgery for the six months that he recuperated, which is pretty good if you think about it. And I know you've seen cases where it's been longer. This is about control. In fact, when you read the record in the arbitrator's decision from the first go-round, he talks about one of their witnesses saying, oh, we wanted him to go work at the Salvation Army. We believe as a corporate policy that you shouldn't sit at home on your butt. Forget what your problems are. Forget what your medical doctor says. Get back there and do something. We own you. If the MASA doesn't have anything for you, we send you down to the next plantation because they need you. Go pick cotton over there in the South 40. This case doesn't violate any law. This case and this commission went through great pains to set forth, contrary to what Mr. Ugaski announced to you, why Mr. Minnick was not credible. He said, oh, I would have had the guy go to tutors. Russick had him go into tutors at Ivy Technical College. He said, oh, I'd help him get a CDL. He already had a CDL. But then they take exception. What do they got left? Well, Cantor Otonino says, oh, I think he can drive an 18-speed over-the-road truck. I don't see any need for an automatic. Dr. Spohr over at Rush, he felt that he did need an automatic. And ultimately he was able to get a job with an automatic truck, which is what we announced at the time of oral argument. And by the way, if the issue of FCEs ever does arise, where evidence of the effectiveness of that test is going to be debated and proven and established, you will find that there are four studies that diminish the impact of an FCE. Why? Simply because it is the most subjective parameter of measurement of the ability of a human being to function. Affirm this case. It shouldn't even be here. We shouldn't be wasting your valuable time on it. Thank you, Your Honor. Thank you, Counsel. McClaw. If I may. Your Honors, at the time of oral argument before the commission, I was asked a question based upon a statement made by a co-counsel or opposing counsel in oral arguments about whether or not the person had returned to work. Merely responded he had. I entered into no stipulation, which would be binding upon my client or before the commission for them to render a decision. We were basing our arguments on the evidence in the record. We believe there is much to be gained not only from my client but from Mr. Colan if this court were to reverse the commission and ask them to institute a different rehabilitation plan in order a new FCE. We're not trying to control or dominate anyone. Suspicion was never raised from the beginning. We went along with the employee's choice of vocational counselor at first. We went along with it for almost, I believe it was close to 18 months before we said this just isn't working. We want to get someone else involved, someone else to address it, to see if they can help the petitioner. I didn't know that trying to help someone get their GED, trying to help them get back to work, earning as much as possible, somehow is exercising control. At what point did you have Mr. Alexie's client pick a cotton? We didn't. Never intended to either. As far as Mr. Minnick identifying a geographically accepted area, I believe Mr. Opposing Counsel is referring to an area in Indiana when all parties agreed as well as the petitioner himself stated he was looking for jobs in Illinois and the Chicago metro area as well. So it just really isn't that relevant. And the final thing I would address is Dr. Sporr, in the record, has never specifically addressed restrictions. He said Mr. Coleman may drive a truck with a manual transmission, and that's great. We agree. He may, too. He never says he can only drive a truck with a manual transmission. Dr. Tonino saw him after that, said, I see no need to restrict him to a manual transmission. I'm sorry, I keep saying manual. I mean automatic. He can drive. Dr. Sporr said he may drive an automatic. He never said he can only drive an automatic. We assert through Dr. Tonino and the fact that Dr. Sporr has not indicated otherwise that he can drive a manual transmission as well. Thank you, Your Honor. Thank you, counsel, for your arguments in this matter. It will be taken under advisement, and this position shall issue.